**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

KIMBERLY HARRIS and ANGELIA STEELMAN,

       Plaintiffs,

v.                                      Case No._____

THE GOVERNING BOARD OF
ARTESIA GENERAL HOSPITAL,
and RICHARD GIBSON,

       Defendants.

**COMPLAINT FOR DAMAGES FROM VIOLATIONS OF TITLE VII AND
THE NEW MEXICO HUMAN RIGHTS ACT, WRONGFUL DISCHARGE,
CONSTRUCTIVE DISCHARGE, ASSAULT, CONSPIRACY,
BREACH OF IMPLIED CONTRACT OF EMPLOYMENT,
BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING,
VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT AND
THE AMERICANS WITH DISABILITIES ACT AMENDMENTS ACT**

      **COMES NOW** Plaintiffs Kimberly Harris and Angelia Steelman [hereinafter "Harris

and "Steelman," respectively], and hereby submit their Complaint for Damages.  As grounds

therefor, Harris and Steelman state as follows:

**I.  JURISDICTION**

      1.     This case arises under 42 U.S.C. §§ 2000e, *et seq.*, ("Title VII"), The Americans

With Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. §§ 12101, *et seq.*, the New

Mexico Human Rights Act ("NMHRA"), NMSA 1978 §§ 28-1-7, *et seq.*, and New Mexico

common law.

      2.     Plaintiff Harris is, and at all times material hereto has been, a resident of the

County of Eddy, State of New Mexico.

      3.     Plaintiff Steelman is now a resident of the County of Cass County, State of Texas;

however, at all times material hereto with respect to the transactions and occurrences of this matter, Steelman was a resident of the County of Eddy, State of New Mexico and the transactions and occurrences occurred in County of Eddy, State of New Mexico.

4.      Defendant The Governing Board of Artesia General Hospital [hereinafter "AGH"] is, and at all times material hereto has been, a duly licensed not-for-profit healthcare organization under the laws of the State of New Mexico, located and principally doing business in the County of Eddy, State of New Mexico.

5.      Defendant Richard Gibson [hereinafter "Gibson"] is, based upon information and belief, a resident of the County of Eddy, State of New Mexico.

6.      On April 24, 2019, the Equal Employment Opportunity Commission (EEOC) issued Steelman a Notice of Right to Sue (NRTS) in relation to Charge No. 543-2018-00978, advising Steelman she had to file suit in court within 90 days of receipt of the NRTS.  This suit is filed within 90 days of Steelman's receipt of the NRTS.

7.      On April 24, 2019, the EEOC also issued a NRTS to Harris with the same filing notification.  This suit is filed within 90 days of Harris' receipt of the NRTS.

8.      This Court has subject matter jurisdiction over the claims set forth herein and personal jurisdiction over the parties.

9.      Venue is proper in this Court.

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, federal question jurisdiction, and 28 U.S.C. § 1343, civil rights jurisdiction.

## II.  FACTUAL ALLEGATIONS

11.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 10 as set forth above.

12.     On April 30, 2014, AGH hired Harris into the position of Administrative Assistant.  Eventually Harris became the Human Resources Director of AGH and was in this position at the time of her involuntary constructive discharge.  As Director, Harris was charged with conducting workplace investigations and ensuring that the policies and procedures of AGH were complied with, among other duties and responsibilities.

13.     In January 2016, AGH hired Steelman into the position of Administrative Assistant and shortly thereafter she became the Administrative Contract Coordinator.  Steelman was in this position, although she performed a variety of additional duties as well, at the time of her involuntary discharge.

14.      During Harris' tenure as Human Resources Director, she became aware of misconduct by some of AGH's physicians, including Abalos, against other personnel employed by AGH.  This behavior of Abalos, for example, created a hostile work environment for other employees, constituted bullying, harassment, and workplace misconduct that violated both AGH policies and federal and State anti-harassment laws.  This unlawful behavior included, but was not limited to, addressing other employees in a vulgar and gross manner, confronting employees with anger, intimidation, and false accusations, and seeking to exclude and prohibit AGH employees from performing their duly appointed duties. In addition, this sort of workplace misconduct was principally, if not exclusively, directed at female employees.

15.     When Harris undertook to conduct required investigations into this sort of discriminatory, harassing misconduct, she was stifled and blocked by the very physicians she sought to investigate, including Abalos and Salgado.  Harris' insistence on halting workplace misconduct by AGH employees created difficult and tense relationships with other AGH employees, including Abalos and Salgado, who had recruited other physicians to support their

troubling behavior.

16.     In January 2018, Abalos engaged in serious misconduct involving an AGH administrator-conduct that violated legal and professional requirements and standards.  This misconduct was investigated somewhat and, during the course of the investigation, Abalos admitted that he had engaged in the misconduct alleged and that his behavior was unprofessional and without justification.

17.     Although Abalos admitted his misconduct, because of his role within AGH and his influence among and with other physicians, Abalos received minor discipline in light of the seriousness of the unlawful behavior and the gravity of the internal policies violated.  By this point, Abalos had so intimidated AGH administrators that he felt emboldened to treat AGH workplace areas as his personal fiefdoms where he ruled with an iron fist.  As the facts later demonstrate, this incident emboldened and encouraged Abalos to act with impunity regarding personnel matters within AGH that were beyond his purview as an AGH physician.

18.     As 2018 moved forward, Harris increasingly became implicated in personnel disciplinary matters that exacerbated the hostility and intimidation present in the AGH workplace environment, especially as it concerned physicians and other healthcare professionals.  In a word, the AGH work environment turned toxic, with a clear division between physicians and administrators.

19.     For example, during the period March-May 2018, a nurse who was a physician's favorite, Irma Salmon, became the subject of several disciplinary actions, imposed by Harris and AGH administration, due to her workplace misconduct, mistreatment of patients and employees, and violations of personnel policies then in place at AGH.

20.     Unbeknownst to AGH administration, including Harris and Steelman, AGH physicians were having secret, unannounced meetings to dispute and defy the implementation

and enforcement of AGH policies and procedures in the workplace, including those implicated in the disciplinary actions involving Salmon.

21.    Salgado and Abalos were in the forefront of physicians who were actively opposing the AGH administration and matters came to a head over a final disciplinary action taken against Salmon.

22.    Following Harris' investigation into on-going violations of AGH policies by Salmon and her continuing mistreatment and harassment of patients and employees, Harris recommended that Salmon be terminated from her employment.  Salgado and Abalos, now determined to rid AGH of female employees in the upper levels of AGH administration, attacked Harris because of her termination recommendation and investigations of Salmon's misconduct.

23.    On May 3, 2018, Harris attended a meeting where Salgado and other AGH employees were present.  The purpose of the meeting was to discuss the termination of Ms. Salmon and the reasons underlying the administration's disciplinary discharge–although Salgado had no authority to intervene in the Salmon situation.

24.    While the meeting was in progress, Salgado, in a belligerent, angry, and an uncontrollable manner, pointed and shook his finger at her and others while spewing out a profanity-laced threat related to "watching their backs."  Salgado also stated he did not want to hear Harris' "HR shit."  Harris was dismayed and shocked by Salgado's behavior.  Salgado engaged in this behavior because by May 2018 he had become accustomed to treating female AGH administrative employees in this manner and had observed and learned of physicians treating female AGH administrative employees in this sort of demeaning and denigrating manner.

25.    Salgado's conduct on May 3, 2018 was but one example of the threatening and intimidating behavior Harris was subjected to by male physicians during the last 12 months of

her AGH employment.

26.     By the beginning of May 2018, a number of the physicians at AGH had banded together for the purpose of having the upper-level management of AGH disciplined or discharged, including Harris.

27.     The Governing Board of AGH met with the group of physicians and AGH's upper-level management on May 21, 2018.  During the course of the meeting, the Governing Board heard from both groups on issues related to hospital management, hostile work environment, physician misconduct, and other matters.

28.     Despite the fact that no evidence demonstrated that AGH administration had acted unlawfully or inappropriately in seeking to operate and manage AGH, the Governing Board decided to favor the arguments and claims of the group of physicians.  In doing so, the Governing Board minimized and ignored the improper, threatening, and demeaning conduct of physicians such as Abalos and Salgado.

29.     The Governing Board proceeded to eliminate the position of the Chief Executive Officer, Robert Tyk. The Chief Executive Officer, the Chief Financial Officer, and the Chief Operations Officer, among others, ended their AGH employment within days of the May 21, 2018 Governing Board meeting.

30.     On May 22, 2018, the CEO notified Harris that she was one of the Administration employees targeted for termination.

31.     The following day, May 23, 2018, Harris entered the workplace and found a document placed on her desk that was a severance agreement.  At that point, Harris understood that her AGH employment had effectively ended, especially in light of the fact that a number of AGH employees had wished her well and they were sorry to see her go.  When Harris confronted Gibson about her removal, Gibson refused to address the matter.

32.     On May 25, 2018, Harris wrote Gibson, the Interim CEO, and some members of the Governing Board an email containing allegations that Harris was being subjected to a hostile work environment and retaliation due to the continuing hostility, intimidation, confrontation, and workplace antagonisms she had endured for quite some time.

33.     Understanding that her employment was about to end, being advised that she had a "target" on her back, and not wanting to have an involuntary termination on her work record, Harris, on May 30, 2018, advised Gibson and the Governing Board that she was involuntarily resigning her position as Human Resources Director.

34.     In her resignation letter, Harris noted, among other things, that she was under undue stress, working in a hostile work environment, and unable to perform her job duties because of the work environment.  Harris emphasized that her resignation was involuntary and resulted from the misconduct she had been subjected to.

35.     Harris was eventually replaced in the Human Resources Director position by a lesser-qualified male.

36.     At all times relevant hereto, Harris performed her duties and responsibilities as AGH's Human Resources Director in at least a satisfactory fashion.

37.     Steelman suffers from a permanent disability known as Familial Hemiplegic Migraines.  This disability causes Steelman to suffer from migraines so severe that they simulate the symptoms of an epileptic episode.  The migraines Steelman suffers are stress-induced.

38.     Familial Hemiplegic Migraines satisfy the meaning of a physical or mental impairment under the ADAAA because Steelman's disability substantially limited one or more of her major life activities–including, but not limited to, caring for herself, performing manual tasks, concentrating, and working.

39.     On June 29, 2017, Steelman presented AGH administration with information from

her neurologist that supported the stress-induced nature of her disability and the symptoms present during an episode.

40. Steelman discussed needed accommodations that would allow her to continue to perform her duties as an AGH employee. AGH provided in June 2017 the following accommodations to Steelman: (1) AGH moved Steelman to an office in the back of the Human Resources area that was quieter and had less traffic; (2) AGH modified Steelman's duties by removing high traffic assignments and allowing Steelman to perform duties that were more individual in nature; (3) should Steelman sense an on-coming episode or suffer an episode while in the workplace, Steelman would be allowed to go home; and (4) Steelman was given a modified schedule allowing her to make up for any work time lost. These accommodations were never withdrawn nor rescinded at any point during Steelman's AGH employment.

41. The documentation Steelman provided to AGH constitutes a record of impairment that substantially limited Steelman within the meaning and purposes of the ADAAA.

42. Additionally, at all times relevant hereto, AGH perceived that Steelman suffered from an impairment that substantially limited Steelman within the meaning and purposes of the ADAAA.

43. Despite having such a disability and impairment that would require Steelman to miss work, at no point during her AGH employment did AGH provide Steelman with the notices required for eligibility and relief under the Family and Medical Leave Act (FMLA)–although at all times after June 29, 2017 Steelman was an "eligible employee" within the meaning of the FMLA.

44. The accommodations provided to Steelman by AGH administration remained in place for approximately one year and Steelman and AGH found the accommodations to be necessary, reasonable, and satisfactory. Throughout the entire time Steelman received workplace

accommodations, she continued to suffer from Familial Hemiplegic Migraines that completely disabled her from performing work duties until the migraines passed.

45.     In late May 2018, Defendant Gibson became the CEO of AGH through approval of the Governing Board.

46.     After Gibson became the AGH CEO, Harris notified Gibson that Steelman had a medical note to file that supported and justified the workplace accommodations that Steelman had exercised for almost a year.

47.     On May 31, 2018, Gibson went to Steelman's office and requested that Steelman take over administration of part of the workload of Harris, who had by now been constructively discharged, related to hospital construction.  Steelman agreed to a limited role in performing duties related to construction tasks.

48.     Steelman indicated to Gibson that she was willing "to help out," however, Steelman could not take over all of Harris' responsibilities because of Steelman's disability and the contrary medical risks assuming the position would entail.

49.     Within five minutes of having had the conversation with Gibson where Steelman stated she could not assume all of Harris' responsibilities tied to construction, Gibson sent out an email to all AGH employees stating that Steelman would now assist the newly-named Human Resources Director–in complete contradiction to Steelman's representations.

50.     Steelman was genuinely and unhappily surprised by the Gibson email because Gibson had never brought up the subject of assisting the new Human Resources Director and Steelman specifically stated to Gibson that she could not assume new permanent duties because of her disability.

51.     Gibson did not bother responding to Steelman's email and did not withdraw his hospital-wide notification email.

52.     Over the period of the next few weeks, Steelman sent Gibson a number of emails dealing with execution and negotiation of contracts and other issues.

53.     During this period of time, Steelman continued to suffer from severe migraine headaches.

54.     On or about June 5, 2018, Steelman emailed Gibson and advised him again that the accommodations that had been previously provided to Steelman–those related to not working in a high traffic volume area, the necessity of quiet, and working by herself would be eliminated if Gibson insisted that Steelman perform the duties Gibson requested.

55.     Gibson once again chose not to respond in any fashion to Steelman's email.

56.     Steelman took vacation time on June 8 and 11, 2018 and returned to work on June 12, 2018.

57.     On June 12, 2018, Steelman returned to work.  Almost immediately Steelman realized that she did not have access to the AGH network and email she needed to perform her job duties.

58.     Shortly thereafter, Stacy Wallace, Gibson's executive assistant, notified Steelman that her presence was needed in Gibson's office.  When Steelman arrived to Gibson's office both Wallace and Cory Yates, the interim Chief Financial Officer, were there with Gibson.

59.     Gibson then stated to Steelman that she was being fired for being insubordinate. Steelman responded to Gibson by asking why Gibson had not responded to the email where Steelman notified Gibson that she could not do the additional duties requested because of her disabling migraines.

60.     Gibson responded angrily to Steelman by stating that Gibson did not serve Steelman, it was not his responsibility to know Steelman's medical health file, it was Steelman's responsibility to do what Gibson told her to do, and Steelman was an "antagonist."

61.     Gibson then ordered Wallace and Yates to escort Steelman to Steelman's office and then off the AGH property.  At no point in her AGH employment did Steelman act in an insubordinate manner towards any supervisor or administrator.

62.     At the time of the factual allegations set forth in this Complaint, AGH had in place personnel policies and procedures and other policies that controlled the management and operation of AGH.

63.     All AGH employees were required to abide by these policies and procedures established by AGH.

64.     AGH managers, supervisors, and directors were required by AGH to implement and enforce these policies and procedures in the workplace.

65.     AGH employees, including Harris and Steelman, reasonably expected that AGH would abide by its own policies and procedures.

## COUNT I

## VIOLATIONS OF TITLE VII

## GENDER DISCRIMINATION

## DISPARATE TREATMENT

66.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 65 as set forth above.

67.     Harris and Steelman are both members of a protected class under Title VII–females.

68.     Both Harris and Steelman suffered adverse employments actions in the form of hostile work environment, retaliation, violations of federal and State rights, threats, involuntary terminations, and other adverse actions because they are female.

11

69.     At all times while adverse employment actions were being taken against them, Harris and Steelman were eminently qualified to perform the duties and responsibilities associated with their respective positions.

70.     At the time of the adverse actions complained of, AGH administration and the Governing Board knew or should have known of these adverse actions and their unlawfulness, yet did nothing.  Indeed, AGH and the Governing Board participated in, approved of, and promoted some of the adverse actions Harris and Steelman complain of.

71.     Harris and Steelman were treated differently and less favorably than male employees not in the protected class.

72.     Despite Harris' and Steelman's qualifications, they were both unlawfully discharged and males eventually filled their positions and/or their jobs were not eliminated.

73.     Any supposed legitimate, non-discriminatory reasons AGH may put forward for the adverse employment actions Harris and Steelman complain of is but a pretext for unlawful gender discrimination.

74.     Harris and Steelman bring this claim against AGH.

75.     Harris and Steelman are entitled to all remedies and relief available to them under Title VII against AGH for their gender-based disparate treatment claims, including, but not limited to, punitive damages for the willful, intentional, wanton, and grossly reckless conduct of AGH.

**COUNT II**

**VIOLATIONS OF TITLE VII**

**GENDER DISCRIMINATION**

**HOSTILE WORK ENVIRONMENT**

76.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 75 as set forth above.

77.     The workplaces of Harris and Steelman were riddled with severe and pervasive discriminatory intimidation, adverse actions, ridicule, threats, and insults that were sufficiently severe to alter the conditions of employment and cause an abusive work environment.

78.     Harris and Steelman were targeted for harassment and workplace hostility because of their sex–female.

79.     A reasonable female in the workplace circumstances of Harris and Steelman would have found the environment to be hostile and intimidating.

80.     Despite the fact that Defendant AGH knew or should have known of the hostile work environment Harris and Steelman were being subjected to, AGH did nothing to timely investigate the hostile work environment complained of, remedy the workplace hostility, or take any action to abate or mitigate the hostile work environment.  On the contrary, AGH, through its words and actions, promoted and participated in the creation of a hostile work environment for both Harris and Steelman.

81.     Any alleged legitimate reason AGH may put forward for this hostile work environment is but a pretext for unlawful workplace discrimination.

82.     Harris and Steelman are entitled to all remedies and relief available to them for the sex-based hostile work environment they suffered from, including punitive damages for the intentional, willful, wanton, and grossly reckless conduct of AGH.

## COUNT III

## VIOLATIONS OF TITLE VII

## RETALIATION

83.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 82 as set forth above.

84.     Harris and Steelman engaged in activity protected under Title VII when they made

complaints and reports that they were being treated disparately in the workplace and being subjected to workplace hostility.

85.     Within weeks and days of submitting their reports of workplace misconduct, both Harris and Steelman were subjected to adverse employment actions in the form of involuntary discharges, hostile and threatening conduct, and open discrimination, among other things.

86.     There exists a causal connection between the protected activity Harris and Steelman participated in and the adverse employment actions they now complaint of.

87.     Any alleged legitimate, non-retaliatory business reason put forth by Defendant AGH is but a pretext for unlawful retaliation under the provisions of Title VII.

88.     Harris and Steelman are entitled to all remedies and relief available to them for Defendant AGH's retaliation, including, but not limited to, punitive damages for the intentional, willful, wanton, and grossly reckless conduct of Defendant AGH.

## COUNT IV
## VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT
## GENDER DISCRIMINATION
## DISPARATE TREATMENT

89.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 88 as set forth above.

90.     Harris and Steelman are both members of a protected class under the NMHRA–females.

91.     Both Harris and Steelman suffered adverse employments actions in the form of hostile work environment, retaliation, violations of State rights, threats, involuntary terminations, and other adverse actions because they are female.

92.     At all times when adverse employment actions were being taken against them,

14

Harris and Steelman were eminently qualified to perform the duties and responsibilities associated with their positions.

93.     At the time of the adverse actions complained of, AGH administration and the Governing Board knew of these adverse actions and their unlawfulness, yet did nothing.  Indeed, AGH and the Governing Board participated in, approved of, and engaged in the adverse actions Harris and Steelman complain of.

94.     Harris and Steelman were treated differently and less favorably than male employees not in the protected class.

95.     Despite Harris' and Steelman's qualifications, they were both unlawfully discharged and males eventually filled their positions and/or their jobs were not eliminated.

96.     Any supposed legitimate, non-discriminatory reasons AGH may put forward for the adverse employment actions Harris and Steelman complain of is but a pretext for unlawful gender discrimination.

97.     Harris and Steelman bring this claim against Defendants AGH and Gibson.

98.     Harris and Steelman are entitled to all remedies and relief available to them under the NMHRA against Defendants AGH and Gibson for their gender-based disparate treatment claims.

## COUNT V
## VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT
## GENDER DISCRIMINATION
## HOSTILE WORK ENVIRONMENT

99.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 98 as set forth above.

100.    The workplaces of Harris and Steelman were riddled with severe and pervasive

15

discriminatory intimidation, adverse actions, ridicule, threats, and insults that were sufficiently severe to alter the conditions of employment–causing an abusive work environment.

101.     Harris and Steelman were targeted for harassment and workplace hostility because of their sex–female.

102.     A reasonable female in the workplace circumstances of Harris and Steelman would have found the environment to be hostile and intimidating.

103.     Despite the fact that Defendants AGH and Gibson knew of the hostile work environment or should have known of the hostile work environment Harris and Steelman were being subjected to, AGH and Gibson did nothing to timely investigate the hostile work environment complained of, remedy the workplace hostility, or take action to stop the hostile work environment.  On the contrary, AGH and Gibson, through their words and actions, promoted and participated in the creation of a hostile work environment for both Harris and Steelman.

104.     Any alleged legitimate reason Defendants AGH and Gibson may put forward for this hostile work environment is but a pretext for unlawful workplace discrimination.

105.     Harris and Steelman are entitled to all remedies and relief available to them under the NMHRA for the gender sex-based hostile work environment they suffered from.

**COUNT VI**

**VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT**

**RETALIATION**

106.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 105 as set forth above.

107.     Harris and Steelman engaged in activity protected under the NMHRA when they made complaints and reports that they were being treated disparately in the workplace and being

16

subjected to workplace hostility.

108.     Within weeks and days of submitting their reports of workplace misconduct, both Harris and Steelman were subjected to adverse employment actions in the form of involuntary discharges, hostile and threatening conduct, and open discrimination.

109.     There exists a causal connection between the protected activity Harris and Steelman participated in and the adverse employment actions they now complaint of.

110.     Any alleged legitimate, non-retaliatory business reason put forth by Defendants AGH and Gibson is but a pretext for unlawful retaliation under the provisions of the NMHRA.

111.     Harris and Steelman are entitled to all remedies and relief available to them for Defendant AGH's and Gibson's unlawful retaliation under the NMHRA.

**COUNT VII**

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES AMENDMENTS ACT**

**FAILURE TO ACCOMMODATE**

112.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 111 as set forth above.

113.     Steelman is disabled within the meaning of the ADAAA.  Steelman's disability is Familial Hemiplegic Migraines.  Defendant AGH had received a record of disability from Steelman in June 2017 and Defendant AGH regarded Steelman as disabled since that time until Steelman's termination.

114.     Steelman communicated her disability to Defendant AGH and was provided plausibly reasonable accommodations for almost one year.  During that period of time Steelman performed her job duties and responsibilities in a qualified manner and her disability did not prevent her from performing essential duties of her position.

115.     Steelman's disability was substantially limiting with respect to the major life

17

activities of working, caring for herself, performing manual tasks, and concentrating, among others.

116.    In late May 2018, Harris advised Gibson that Steelman had medical restrictions in her personnel file that had been in place for some time.

117.    In early June 2018, after a change in AGH administration, AGH withdrew the reasonable accommodation provided to Steelman, requiring her to work and perform duties that violated her medical restrictions and limitations.

118.    At no point was Steelman unable to perform the essential functions of her position, with or without reasonable accommodations.

119.    The withdrawal of the accommodations provided previously violates the provisions of the ADAAA.

120.    The accommodation previously provided did not constitute an undue hardship during any point of Steelman's AGH employment and AGH never claimed that the accommodation provided or imposed an undue hardship on AGH.

121.    Steelman is entitled to all remedies and relief available to her under the ADAAA for the unlawful acts of AGH, including, but not limited to, punitive damages for the intentional, willful, wanton, and grossly reckless conduct of AGH.

## COUNT VIII

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES AMENDMENTS ACT RETALIATION

122.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 121 as set forth above.

123.    At all times relevant hereto, Defendant AGH knew of Steelman's disability. Moreover, Defendant AGH regarded Steelman as a "disabled individual" within the meaning of

18

the ADAAA.  Moreover, Defendant AGH had received from Steelman a record of her disability.

124.    Steelman engaged in protected activity by reporting to Gibson on June 5, 2018 that she could not report to work due to her disability.  Additionally, Steelman had previously notified Gibson that she could not perform certain duties requested by Gibson because of her disability.

125.    Gibson almost immediately decided to terminate Steelman after learning of these disability reports, without notifying Steelman of his intention to end her employment with AGH.

126.    From the time that Gibson learned of Steelman's medical restrictions and accommodations until the date of Steelman's involuntary discharge, Gibson subjected Steelman to workplace hostility and intimidation.

127.    The adverse employment actions Steelman complains of above followed almost immediately her participation in protected activity under the ADAAA.

128.    A causal connection exists between Steelman's participation in ADAAA-protected activity and the adverse actions she now complains of.

129.    Any alleged legitimate, non-retaliatory business reasons Defendant AGH may put forward for its unlawful behavior is but a pretext for ADAAA-related retaliation.

130.    Steelman is entitled to all remedies and relief available to her under the ADAAA for Defendant AGH's unlawful behavior, including, but not limited to, punitive damages for the intentional, willful, wanton, and grossly reckless conduct of Defendant AGH.

### COUNT IX

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES AMENDMENTS ACT WRONGFUL TERMINATION

131.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 130 as set forth above.

132.    Steelman is a "disabled individual" within the meaning of the ADAAA–suffering from Familial Hemiplegic Migraines, a permanent and major disability.

133.    During all times relevant hereto, Steelman was and is qualified, with or without reasonable accommodation, to perform the essential functions of the jobs she performed for AGH.

134.    Despite being qualified, AGH discriminated against Steelman by terminating her because of her disability.

135.    At all times relevant hereto, Defendant AGH regarded Steelman as a disabled individual and Steelman provided Defendant AGH with a record of her disability.

136.    Any alleged legitimate, non-discriminatory business reasons Defendant AGH may put forward for its discriminatory termination of Steelman is but a pretext for unlawful disability discrimination.

137.    Steelman is entitled to all remedies and relief available to her under the ADAAA against Defendant AGH for its unlawful and discriminatory conduct, including, but not limited to punitive damages for the intentional, willful, wanton, and grossly reckless conduct of Defendant AGH.

## COUNT X

## VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT

## DISABILITY DISCRIMINATION

138.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 137 as set forth above.

139.    Steelman is a "disabled individual" within the meaning of the –suffering from Familial Hemiplegic Migraines, a permanent and major physical handicap and serious medical condition within the meaning of the NMHRA.

140.    During all times relevant hereto, Steelman was and is qualified, with or without

reasonable accommodation, to perform the essential functions of the jobs she performed for AGH.

141.    Despite being qualified, AGH discriminated against Steelman by terminating her because of her physical handicap and/or serious medical condition.

142.    At all times relevant hereto, Defendant AGH regarded Steelman as a disabled individual and Steelman provided Defendant AGH with a record of her disability.

143.    Any alleged legitimate, non-discriminatory business reasons Defendants AGH and Gibson may put forward for its discriminatory termination of Steelman is but a pretext for unlawful disability discrimination.

144.    Steelman is entitled to all remedies and relief available to her under the NMHRA against Defendants AGH and Gibson for their unlawful and discriminatory conduct.

## COUNT XI

## VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT

## FAILURE TO ACCOMMODATE

145.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 144 as set forth above.

146.    Steelman suffers from a physical handicap and/or serious medical condition within the meaning of the NMHRA.  Steelman's handicap and/or serious medical condition is Familial Hemiplegic Migraines.  Defendant AGH had received a record of disability from Steelman in June 2017 and Defendants AGH and Gibson regarded Steelman as disabled.

147.    Steelman communicated her disability to Defendants AGH and Gibson and was provided plausibly reasonable accommodations for almost one year.  During that period of time Steelman performed her essential job duties and responsibilities in a qualified manner and her physical handicap and/or serious medical condition did not prevent her from performing duties

within her limitations.

148.    Steelman's handicap and/or serious medical condition was substantially limiting with respect to the major life activities of working, caring for herself, performing manual tasks, and concentrating, among others.

149.    In late May 2018, Harris advised Gibson that Steelman had medical restrictions in her personnel file that had been in place for some time.

150.    In early June 2018, after a change in AGH administration, AGH and Gibson withdrew the reasonable accommodation provided to Steelman, requiring her to work and perform duties that violated her medical restrictions and limitations.

151.    At no point was Steelman unable to perform the essential functions of her position, with or without reasonable accommodations.

152.    The withdrawal of the accommodation provided previously violates the provisions of the NMHRA.

153.    The accommodation previously provided did not constitute an undue hardship during any point of Steelman's AGH employment and AGH nor Gibson never claimed that the accommodation provided imposed an undue hardship on AGH.

154.    Steelman is entitled to all remedies and relief available to her under the NMHRA for the unlawful acts of AGH and Gibson.

**COUNT XII**

**VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT**

**RETALIATION BECAUSE OF DISABILITY**

155.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 154 as set forth above.

156.    At all times relevant hereto, Defendants AGH and Gibson regarded Steelman as

an employee with a physical handicap or serious medical condition within the meaning of the NMHRA.  Moreover, Defendant AGH had received from Steelman a record of her disability.

157.    Steelman engaged in protected activity by reporting to Gibson on June 5, 2018 that she could not report to work due to her physical handicap and/or serious medical condition. Additionally, Steelman had previously notified Gibson that she could not perform certain duties requested by Gibson because of her physical handicap and/or serious medical condition.

158.    Gibson almost immediately, after being notified of Steelman's leave request because of her physical handicap and/or serious medical condition, decided to terminate Steelman after learning of these reports, without notifying Steelman of his intention to end her employment with AGH.

159.    From the time that Gibson learned of Steelman's medical restrictions and accommodations until the date of Steelman's involuntary discharge, Gibson subjected Steelman to workplace hostility and intimidation.

160.    The adverse employment actions Steelman complains of above followed almost immediately her participation in protected activity under the NMHRA.

161.    A causal connection exists between Steelman's participation in NMHRA-protected activity and the adverse actions she now complains of.

162.    Any alleged legitimate, non-retaliatory business reasons Defendants AGH and Gibson may put forward for its unlawful behavior is but a pretext for NMHRA-prohibited retaliation.

163.    Steelman is entitled to all remedies and relief available to her under the NMHRA for Defendants AGH's and Gibson's unlawful behavior.

## COUNT XIII

## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT
## INTERFERENCE

164.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 163 as set forth above.

165.     During the period June 2017 until the date of Steelman's termination, Steelman was entitled to FMLA leave due to her serious health condition of Familial Hemiplegic Migraines.

166.     The documentation Steelman provided to AGH related to her disability demonstrated that Steelman was eligible for FMLA leave and the medical record constituted notice by Steelman of her intent for FMLA-qualifying leave.

167.     Despite this obvious eligibility for FMLA, at no point in time did any AGH employee advise Steelman of FMLA eligibility and did not provide Steelman a notice of eligibility that conformed to requirements of the FMLA and the corresponding FMLA regulations.

168.     The decision of AGH and Gibson to terminate Steelman on the heels of her requesting FMLA-eligible leave constitutes an adverse action that interfered with Steelman's the present and continuing right to take FMLA leave.

169.     AGH's and Gibson's decisions to terminate Steelman because of the exercise or attempted exercise of her FMLA rights were unlawful.

170.     If AGH had notified Steelman of her eligibility for FMLA leave, Steelman would have availed herself of such leave when necessary to protect her continued AGH employment.

171.     Steelman was prejudiced by AGH's and Gibson's failure to provide notice of FMLA eligibility to Steelman in that she would have availed herself of FMLA leave and

protected herself from the summary termination implemented by Gibson and AGH.

172.    Steelman is entitled to all remedies and relief available to her against Defendants AGH and Gibson individually for this FMLA interference, including an award of liquidated damages for the intentional and willful conduct of AGH and Gibson in violating Steelman's FMLA rights.

## COUNT XIV

## VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT

## RETALIATION

173.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 172 as set forth above.

174.    Steelman engaged in protected activity under the FMLA when she first reported her FMLA-qualifying serious health condition to AGH, advised Gibson of her serious health condition and restrictions in late May 2018, and requested leave in June 2018 related to her FMLA-qualifying serious health condition.

175.    Following these reports and notifications by Steelman, AGH and Gibson took adverse employment actions in the form of workplace hostility, false and unjustifiable discipline, and involuntary discharge.

176.    A causal connection exists between Steelman's participation in protected activity and the adverse employment actions she complains of herein.

177.    Any alleged, non-retaliatory business reason AGH and Gibson may put forth is but a pretext for unlawful retaliation under the provisions of the FMLA.

178.    Steelman is entitled to all remedies and relief available to her under the FMLA for the unlawful conduct of AGH and Gibson, including an award of liquidated damages for the intentional and willful violations by AGH and Gibson of Steelman's FMLA rights.

**COUNT XV**

**VIOLATIONS OF TITLE VII**

**CONSTRUCTIVE DISCHARGE**

179.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 178 as set forth above.

180.     At the time of the change in AGH administration in late May 2018, and despite the hostile work environment and discrimination she was being subjected to, Harris fully intended to remain employed with AGH.

181.     However, Harris was advised by those in the AGH administration and others that her employment would be terminated.

182.     Harris received the confirmation that this was true when she entered the workplace the following day and discovered that a severance package providing for terms for her separation from AGH was on her desk, employees stated that they were sorry to see her go, and Gibson, the interim CEO, would not answer Harris' inquiries related to her job security.

183.     In addition, the hostile work environment Harris had been subjected to over time had worsened and Harris caused her to reasonably fear for her well-being and safety in the workplace.

184.     Threats made involving Harris' personal safety, witnessed by other managers and supervisors of AGH, caused Harris to reasonably fear for her well-being and personal safety.

185.     During the last week, Harris found the working conditions so intolerable in the face of an impending termination and fears for her safety, that Harris felt forced to quit her AGH employment.

186.     A reasonable person in Harris' circumstances would have considered the working conditions so intolerable that she would have felt compelled to resign.  Indeed, Harris specifically

mentioned in her resignation letter to AGH that her resignation was involuntary and related to the hostile work environment she encountered.

187.    Aggravating factors are present in this case that are in addition to the discrimination claims Harris has set forth.

188.    Harris is entitled to all remedies and relief available to her under Title VII for the constructive discharge she complains of against Defendant AGH, including, but not limited to punitive damages for the intentional, willful, wanton, and grossly reckless unlawful conduct of AGH in constructively discharging Harris.

**COUNT XVI**

**VIOLATIONS OF THE NEW MEXICO HUMAN RIGHTS ACT**

**CONSTRUCTIVE DISCHARGE**

189.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 188 as set forth above.

190.    At the time that Harris submitted her involuntary resignation, she was both advised verbally by reliable sources and through a severance letter that she would be terminated.

191.    In addition, at the time of her involuntary resignation, Harris was subjected to unreasonable and unfair criticism and antagonism from AGH physicians and the Governing Board.

192.    Moreover, once the working conditions became so objectively intolerable that Harris could no longer remain employed with AGH, Harris submitted her involuntary resignation almost immediately.

193.    It is undisputed that Harris was subjected to physically intimidating conduct just weeks prior to her involuntary resignation.

194.    Despite AGH being aware of this discrimination and hostile work environment in violation of the NMHRA, AGH did nothing to remedy the work circumstances Harris found

herself in.

195.     The workplace environment and conditions were so objectively intolerable that a reasonable person in Harris' circumstances would have felt compelled to resign.

196.     Harris is entitled to all remedies and relief available to her against Defendants AGH, and Gibson under the NMHRA for the constructive discharge she complains of.

## COUNT XVII

## BREACH OF AN IMPLIED CONTRACT OF EMPLOYMENT

197.     Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 196 as set forth above.

198.     AGH published and distributed policies and procedures to its employees addressing subjects such as disciplinary actions, workplace investigations, equal employment opportunity, workplace harassment, complaint handling, standards of conduct, safe work environment, and zero tolerance for violence.

199.     These personnel polices and procedures expressed an intent to be bound on the part of AGH and its employees.

200.     All employees, including supervisors and managers, were required to abide by these policies and procedures.

201.     Employees who violated these policies and procedures could be subjected to disciplinary action, up to and including termination.

202.     It was the duty and obligation of AGH supervisors and managers to implement and enforce these policies and procedures in the workplace.

203.     At all times relevant hereto, it was the reasonable expectation of Harris and Steelman that AGH supervisors and managers would abide by these policies and procedures.

204.     During the periods and times set forth in this Complaint for Damages, AGH

repeatedly breached and violated its own policies and procedures as set forth in paragraph 198 above, which detrimentally affected the terms and conditions of Harris' and Steelman's employment.

205.    These breaches of the implied contract of employment caused damages to both Harris and Steelman.

206.    Harris and Steelman are entitled to all remedies and relief available against Defendant AGH for these breaches of the implied contract of employment.

## COUNT XVIII

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

207.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 206 as set forth above.

208.    The implied contract of employment set forth previously signified that the terms and conditions of Harris' and Steelman's employment were contained within that contract.

209.    Defendant AGH breached the covenant of good faith and fair dealing associated with any contract in the State of New Mexico by not performing in accordance with their contractual obligations set forth in the implied contracts pertinent to both Harris and Steelman.

210.    It is a breach of contractual duty to act in bad faith with respect to the terms and conditions of any contract in New Mexico.  Good faith requires that a party to the contract act honestly and in accordance with the standards of fair dealing.

211.    Defendant AGH breached the covenant of good faith and fair dealing by, among other things, making false and accusatory statements against both Harris and Steelman, intentionally creating and allowing a hostile work environment for Harris and Steelman, intentionally breaching the implied contract of employment, and failing to provide any relief for the breaches made known by Harris and Steelman.

212.    Defendant AGH acted in this manner because it had decided to separate Harris and Steelman from their AGH employment for unlawful reasons and despite their knowledge of the hostility and mistreatment Harris and Steelman were being subjected to.

213.    Harris and Steelman are entitled to all remedies and relief available to them for Defendant AGH's breaches of the covenant of good faith and fair dealing, including, but not limited to, punitive damages for the intentional, willful, wanton, and grossly reckless conduct of AGH.

## COUNT XIX

### CIVIL CONSPIRACY

214.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 213 as set forth above.

215.    A conspiracy existed between the members of the Governing Board, Gibson, and the physicians of AGH.

216.    The conspiracy included conspiring and colluding to discriminate and retaliate and create a hostile work environment for Harris and Steelman with the purpose of separating them from their AGH employment by threats, false accusations, intimidation, and breaches of the implied contract of employment.

217.    As a result of this conspiracy, both Harris and Steelman were deprived of their AGH employment and suffered damages.

218.    Harris and Steelman are entitled to all remedies and relief against AGH and Gibson, for their participation in the conspiracy set forth above.

### DAMAGES

219.    Harris and Steelman hereby adopt and incorporate by reference paragraphs 1 through 218 as set forth above.

220.    Harris and Steelman seek damages in the form of back pay and lost benefits.

221.    Harris and Steelman seek damages in the form of front pay and future benefits.

222.    Harris and Steelman seek damages in the form of mental, emotional, and psychological distress.

223.    Harris and Steelman seek damages in the form of exemplary or punitive damages for the intentional, malicious, willful, wanton, and grossly reckless conduct of AGH.

224.    Steelman seeks damages in the form of liquidated damages on her FMLA claims for the willful conduct of Defendants AGH and Gibson.

225.    Harris and Steelman seek pre- and post-judgment interest on all their claims.

226.    Harris and Steelman seek an award of their attorney's fees and costs on their statutory claims where such award is allowable under statute, rule, or law.

**WHEREFORE** Harris and Steelman respectfully request that this Court grant them judgment in their favor on the claims set forth herein, an award of attorney's fees and costs where allowable, and such further relief the Court deems just and appropriate under the circumstances.

Respectfully submitted,

LAW OFFICES OF MICHAEL E. MOZES, PC

*/s/ Michael E. Mozes*
MICHAEL E. MOZES
Attorney for Plaintiffs
5732 Osuna Rd. NE
Albuquerque, NM 87109-2527
(505) 880-1200
(505) 881-2444 (fax)
Michael@mozeslawoffice.com